IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )   1:95-cr-53 (LMB) |
| KEITH EUGENE GAFFNEY, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

Before the Court is Defendant Keith Eugene Gaffney's ("defendant" or "Gaffney")[1] Renewed Motion for Compassionate Release ("Motion"), in which he argues that his age, deteriorating health, susceptibility to COVID-19, and sentence length justify his release from nearly fifty continuous years in custody. [Dkt. No. 204]. The government opposes his motion, which has now been fully briefed. For the following reasons, defendant's Motion will be granted, and his sentence will be reduced from life imprisonment to a term of time served effective Monday, April 3, 2023.

### I. BACKGROUND

Gaffney, now 68 years old, has been incarcerated since September 1973, when he was charged in the District of Columbia ("D.C.") Superior Court with assault with intent to rape while armed, assault with intent to kill while armed, two counts of armed robbery, two counts of rape while armed, kidnapping, carrying a pistol without a license, burglary while armed, and armed robbery. [Dkt. No. 157] at ¶¶ 56, 60. As discussed in the Court's May 12, 2021, Order, the D.C. case was based on the following facts. On July 29, 1973, the defendant and another

---

[1] Gaffney legally changed his name to "Khalid Abdul Mujahid" in 1996 but is referred to as Gaffney throughout the pleadings and will be referred to as Gaffney in this Order.

individual, Willie Engram ("Engram"), were in the home of "Victim-1," along with "Victim-2" and "Victim-3." Id. at ¶ 56. While in Victim-1's home, defendant and Engram held Victim-1 at gunpoint, demanded narcotics, and then shot her in the chest. Id. Defendant and Engram robbed the victims in the home, and Engram raped Victim-2. Id. Defendant and Engram proceeded to kidnap Victim-2, use heroin, and rape her throughout the day. Id. They eventually took Victim-2 to the home of Victim-4, and defendant later robbed, raped, and threatened to kill Victim-4 over the course of eight hours. Id. After a trial, defendant was ultimately sentenced to 24 years to life imprisonment. [Dkt. No. 157] at ¶¶ 56, 60, 63; [Dkt. No. 183] at 3.

The sentence from which defendant is seeking compassionate release is based on his conduct between 1989 and 1994, when defendant, while incarcerated at the Lorton Reformatory serving his D.C. sentence, ran a vast drug conspiracy using a network of visitors, correctional officers, and drug runners to receive and distribute heroin, hydromorphone, and other contraband. [Dkt. No. 157] at ¶¶ 7–40. He also induced other inmates to commit acts of violence as part of the enterprise. Id. ¶¶ 20, 29, 31. On May 23, 1995, based on these actions, a jury in this district convicted defendant of conspiracy to possess and distribute heroin and hydromorphone in violation of 21 U.S.C. § 846 (Count 1), engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(b) (Count 2), assault with intent to commit robbery in violation of 18 U.S.C. §§ 2 and 113(b) (Count 5), assault with a dangerous weapon in violation of 18 U.S.C. §§ 2 and 113(c) (Count 8), and possession with intent to distribute hydromorphone in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2 (Count 9). [Dkt. No. 67]. Defendant was ultimately sentenced[2] to life imprisonment on Count 2, concurrent sentences of 10 years'

---

[2] Because the sentencing judge has retired, this case has been randomly reassigned to the undersigned judge.

2

imprisonment on Counts 5 and 8, and 20 years' imprisonment on Count 9.[3] The entire sentence was imposed to run consecutively to the D.C. sentence. [Dkt. No. 119]. Gaffney was also sentenced to a five-year term of supervised release on each of Counts 2 and 9, and a three-year term of supervised release on Counts 5 and 8, to run concurrently with each other. Id.

In 1997, Gaffney was transferred from USP Marion, a medium-security facility in Illinois, to USP Florence ADX ("Florence"), the Bureau of Prison's ("BOP") maximum-security prison in Colorado, because of his role in a "major disturbance" between black and white inmates at USP Marion. [Dkt. No. 198-1] at 2. According to a warden at Florence, "The involved Black inmates were mostly from the Washington D.C. area and considered under the influence of [defendant]." Id. Defendant has been incarcerated at USP Florence since then. During his time there, defendant has taken over fifty courses covering a wide range of subjects [Dkt. No. 183-2], and he claims that he is housed along with the most well-behaved inmates in what is known as the "honor unit," [Dkt. No. 179-1] at 13. He has not had any disciplinary infractions since 2007, when he was disciplined for possessing documents sent by his attorney and using the mail without authorization.[4] [Dkt. No. 194] at 2. Although defendant is classified as a "High Security Level inmate with Maximum custody," the warden, in letters dated March 2014 and June 2015, requested that defendant be redesignated to a lower security facility and stated that defendant "has recently exhibited good behavior" and "has established a good rapport with staff and is not considered a management problem." [Dkt. No. 198-1] at 2-3. Evidently, the warden's requests were unsuccessful, as defendant was never transferred.

---

[3] On appeal, the Fourth Circuit vacated his conviction for Count 1 because he could not be convicted for both conspiracy and engaging in a continuing criminal enterprise. United States v. Gaffney, No. 95-5795, 1996 WL 515241, at *1 n.2 (4th Cir. Sept. 11, 1996).

[4] His last significant disciplinary infraction occurred in December 2002, when defendant was disciplined for threatening bodily harm. [Dkt. No. 194] at 2.

On December 28, 2020, defendant filed a pro se Motion for Compassionate Release Pursuant to 18 U.S.C. 3582(c)(1)(A) ("Motion for Compassionate Release") [Dkt. No. 179] and a Motion For This Honorable Court to Order a Public Defender to Review the Petitioner's Compassionate Release Motion, to Determine if the Motion Presents Extraordinary and Compelling Reasons That Warrant Appointment of Counsel, for a Second Look at Resentencing Under the Act Which the Petitioner Asserts That It Does ("Motion to Appoint Counsel") [Dkt. No. 180]. In his Motion for Compassionate Release, defendant claimed, among other things, that he was indicted in this district "based on the purchased testimony of admitted drug addicts, and inmates testifying for plea bargains on their pending cases, and paid inmates who were government informers who admitted under oath that they were paid to testify on other Lorton, [sic] prison cases." [Dkt. No. 179] at 2.

The Court granted his Motion to Appoint Counsel [Dkt. No. 182], and defense counsel filed supplemental briefing as to defendant's Motion for Compassionate Release [Dkt. No. 183], which the Court denied without prejudice on May 12, 2021. [Dkt. No. 203]. The Court found that defendant was nearly 70 years old and had been incarcerated since he was 19 years old, and that he "clearly suffers from some serious health conditions." Id. at 5. Nonetheless, the Court found that because defendant's "crimes in the District of Columbia were far more serious" than the crimes for which he was "found guilty in this court," "it would be premature to address the sentence imposed in this court until the status of defendant's District of Columbia sentence is resolved." Id.

At the time, defendant had an application for parole pending before the United States Parole Commission. The application, submitted in March 2021, was the first time he applied for parole, even though he had been eligible for parole since September 18, 2004. [Dkt. No. 157] at

4

¶ 63; [Dkt. No. 195] at 6. On June 28, 2021, the U.S. Parole Commission granted defendant's application for parole "effective July 24, 2021 after the service of 479 months" in prison. [Dkt. No. 204-1]. Accordingly, as of July 24, 2021, defendant began serving the sentence imposed by this court in 1995. [Dkt. No. 204-1]. The following month, on August 24, 2021, defendant filed a Renewed Motion for Compassionate Release, which is now fully briefed and ripe for review. [Dkt. No. 204].

## II. DISCUSSION

### A. Exhaustion

Defendant asks this Court to reduce his life sentence to time-served effective six months from the date of the order pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). To be eligible for compassionate release under § 3582(c)(1)(A)(i), a defendant must have first "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). Defendant submitted a written request for compassionate release to the Florence warden on November 18, 2020, which was denied on December 3, 2020. [Dkt. Nos. 179-2, 179-3]. Accordingly, defendant has properly exhausted his administrative remedies.

### B. Extraordinary and Compelling Reasons

In addition to meeting all administrative exhaustion requirements, an inmate seeking to modify a sentence under § 3582(c)(1)(A)(i) must also show "extraordinary and compelling reasons to warrant . . . a reduction" of his sentence. District courts are "empowered . . . to consider any extraordinary and compelling reason for release that a defendant may raise." United States v. McCoy, 981 F.3d 271, 284 (4th Cir. 2020) (quoting United States v. Brooker,

5

976 F.3d 228, 230 (2d Cir. 2020)).

Defendant argues, in part, that his advanced age and deteriorating health justify his release because they meet the criteria set forth in a policy statement from the United States Sentencing Commission. [Dkt. No. 195] at 3-4. Under that policy statement, a defendant's medical condition can be an extraordinary and compelling reason if the defendant is "experiencing deteriorating physical or mental health because of the aging process . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A). The policy statement also states that a defendant's age can be an extraordinary and compelling reason if "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13 cmt. n.1(B). These are not elements that the defendant must establish to justify release; rather, they "permit[] a fact-specific, flexible analysis of potentially extraordinary and compelling reasons for release that turns on the defendant's age and the particular conditions and circumstances presented by his physical and mental health." United States v. Greene, 516 F. Supp. 3d 1, 23 (D.D.C. 2021).

Although Gaffney satisfies the age and health components of this policy, he has not served "at least 10 years or 75 percent of his . . . term of imprisonment," despite having virtually served his entire adult life in prison, because nearly all of that time was for the sentence imposed by the D.C. Superior Court. Gaffney only began serving the sentence imposed by this court on July 24, 2021. As a result, he has only served eight months of the life "term of imprisonment" imposed for the crimes he committed at Lorton.

Nonetheless, defendant satisfies the criteria for medical conditions because he is nearly 70 years old and suffering from several conditions that diminish his ability to care for himself, and from which he will not recover. Defendant suffers from glaucoma and macular degeneration, the latter being an "incurable eye disease" that "is caused by the deterioration of the central portion of the retina." [Dkt. No. 195] at 4 n.4; [Dkt. No. 204] at 3. Although the stage of defendant's macular degeneration is not in the record, the evolution of his eye treatment is a strong indication that he is losing his vision, which will undoubtedly impede his ability to care for himself. For example, in November 2020, the BOP treated defendant's macular degeneration with "two capsules by mouth each day," but by July 13, 2021, he had to be taken "offsite" to an ophthalmologist for Avastin injections directly into his eye. [Dkt. No. 198] at 10; [Dkt. No. 204] at 3; [Dkt. No. 208] at 1. More importantly, the "offsite" ophthalmologist stated that a follow-up appointment was necessary in "4-6 weeks" for "likely repeat Avastin injection." [Dkt. No. 208] at 1.

Although the government has questioned the seriousness of defendant's other ailments,[5] it has not questioned or provided evidence rebutting the severity of his deteriorating eyesight. Instead, the government argues that deteriorating eyesight is not an extraordinary and compelling reason for Gaffney's release because it is being adequately treated and is therefore manageable in prison. [Dkt. No. 212] at 7. "[I]t is generally true that 'chronic conditions that can be managed in prison are not a sufficient basis for compassionate release," United States v. Molina, No. 3:15-cr-31, 2021 WL 1323402, at *2 (E.D. Va. Apr. 8, 2021) (quoting United States v. Ayon-Nunez,

---

[5] Defendant also suffers from an enlarged prostate [Dkt. No. 183] at 12; hematuria, which entails blood in the urine [Dkt. No. 195] at 3; and hypertension [Dkt. No. 214] at 1, among other conditions.

7

No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020)); however, the record does not inspire confidence that defendant will consistently receive adequate treatment.

This doubt arises from the BOP's inexplicable failure to treat Gaffney's hepatitis C for over two decades. Hepatitis C is a "liver infection caused by the hepatitis C virus" that can potentially lead to "life threatening health problems like cirrhosis and liver cancer." [Dkt. No. 183] at 10. Defendant's medical records show he tested positive for hepatitis C in 1998; however, the BOP lost the 1998 medical record when it switched to a new medical record system in "late 2008." [Dkt. No. 186] at 12. Consequently, when defendant "wrote to Medical wanting to be treated for hepatitis C . . . he was told he didn't have hepatitis C as there is no reference to him having hepatitis C in BEMR," the new record keeping system. Id. When the BOP finally found his old medical records around October 2020, "[n]ew labs were sent and do confirm an active case of hepatitis C." Id. at 12-13. Even the government admits that the "BOP obviously should have done better." [Dkt. No. 212] at 7 n.1. As defense counsel argues, this example of mismanagement "speaks to systemic failures in the provision of health care to inmates within the BOP" and refutes any notion that defendant's medical conditions can be managed in prison. [Dkt. No. 213] at 3.

Although it is Gaffney's deteriorating health that fits most neatly within the sentencing commission's policy statement, it is the combination of his age (68), extraordinary length of time continuously in prison (nearly 50 years), and deteriorating health that justify a significant reduction in his sentence. In McCoy, the Fourth Circuit explicitly approved the district courts' consideration of "the sheer and unusual length of the sentences." 981 F.3d at 285. Defendant's nearly 50-year prison term—24 years of which have been in the austere conditions of a maximum-security prison—is certainly unusual, as it is almost twice as long as federal sentences

imposed for murder. United States v. Bryant, No. 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months."). These circumstances, in their totality, are far from common.[6]

C. **Section 3553(a) Factors**

Because Gaffney has demonstrated extraordinary and compelling reasons for his release, the Court must consider the sentencing factors in 18 U.S.C. § 3553(a) "in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment." United States v. High, 997 F.3d 181, 186 (4th Cir. 2021). Each factor will be addressed in turn.

The first factor is "the nature and circumstances of the offense and the history and characteristics of the defendant." § 3553(a)(1). The Court recognizes the very serious nature of Gaffney's offenses, which counsels against release; however, his record also demonstrates that Gaffney is not the same person who was convicted in this district nearly thirty years ago. Defendant has not had any disciplinary infractions in 15 years, and even then that incident was minor and nonviolent, as he was only disciplined for possessing documents sent by his attorney and using the mail without authorization. While incarcerated, defendant has completed over fifty courses spanning a wide range of subjects. And although he has been incarcerated at Florence since 1997 as a "High Security Level inmate with Maximum Custody," the wardens at the facility have repeatedly requested that he be transferred to a lower-level facility because of his

---

[6] Accordingly, the Court does not need to opine on defendant's argument that he faces a particular risk of COVID-19 at Florence and that there is a "gross disparity" between his life sentence, which was imposed under the then-mandatory sentencing guideline regime that was later declared unconstitutional in United States v. Booker, 543 U.S. 220 (2005), and the sentence he would receive if sentenced today.

9

good behavior. [Dkt. No. 198-1] at 2, 5. Of particular significance is the finding by the U.S. Parole Commission that Gaffney was worthy of parole with regards to his D.C. crimes, which were "far more serious" than the crimes he committed in this district. [Dkt. No. 203, 204-1]. Accordingly, on balance, this factor weighs in favor of a sentence modification.

The second § 3553(a) factor is "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2). Although defendant just started serving the sentence imposed in this district, the sheer length of time defendant has spent in prison—virtually his entire adult life—mitigates any concern that his sentence does not reflect the seriousness of his offenses. See United States v. Mumford, 544 F. Supp. 3d 615, 619-20 (E.D. Va. 2021) (finding that reducing defendant's sentence "in no way diminishes the seriousness of the offenses" given that defendant had already been incarcerated for more than 25 consecutive years). Moreover, as defense counsel points out, Gaffney would be much further along in this sentence if he had applied to be paroled from his D.C. sentence sooner than 2021, when he was granted parole on his first try. He was eligible for parole in 2004 but did "not apply until recently due to the dual sentences he faced as well as a lack of legal representation." [Dkt. No. 213] at 5. If, for example, he had been granted parole in 2015, he could now be seven years along in the sentence imposed in this district. Consequently, defendant having only served eight months, as opposed to several years, of his sentence is not a compelling consideration.

The parties also dispute whether defendants' continued incarceration is necessary "to

10

protect the public from further crimes of the defendant." The government argues based on population-level recidivism rates that defendant is still a danger to the public. Specifically, the government cites data from the U.S. Sentencing Commission showing a 35.7% recidivism rate for offenders like defendant who were between 41 and 50 years old when sentenced and had a criminal history category V. Measuring Recidivism, U.S. Sentencing Commission, at 28 (Exhibit 9) (2004). The government also cites data from a 2016 U.S. Sentencing Commission study showing that offenders with a criminal history category V like defendant have a rearrest rate of 77.8%. Recidivism Among Federal Offenders, U.S. Sentencing Commission, at 18-19 (2016).

Neither statistic paints a full picture. The 77.8% figure does not differentiate based on age and does not consider health conditions. In fact, the same study explicitly recognizes age as an important factor when it comes to recidivism, stating that "the older the age" at release, "the lower the arrest rate," and offenders who are released when they are older than 60 have a rearrest rate of only 16.0%. Id. at 23. The former 35.7% recidivism statistic gives a more holistic view given that it accounts for both criminal history and age at sentencing; however, even this figure fails to consider factors that would further reduce defendant's chance of recidivating, such as his deteriorating health and efforts towards rehabilitation. See United States v. Redwine, No. 3:87-cr-70, 2020 WL 6829848, at *8 (E.D. Va. Nov. 20, 2020) (finding that "ill health" reduces the risk of recidivism); Mumford, 544 F. Supp. 3d at 619 (finding that rehabilitation efforts mitigate against risk of recidivism). Although his rehabilitation efforts are somewhat undermined by his apparent refusal to accept responsibility for the offenses he committed in this district, given that he still blames his conviction "on the purchased testimony" of witnesses, the Court is still satisfied that his imminent release would not endanger the public, because defendant is nearly 70

11

years old, is suffering from several serious medical conditions, and has had a clean record for 15 years.

The third and fourth § 3553(a) factors focus on the "kinds of sentences available" and the "sentencing range" for defendant's offenses. §§ 3553(a)(3), (a)(4). As defendant points out, when his life sentence was imposed, the sentencing guidelines were mandatory; however, not only are the guidelines no longer mandatory, see United States v. Booker, 543 U.S. 220 (2005), but the guideline range that would have applied to his case today would be a range of 360 months to life, from which a sentencing court could depart. As for the fifth, sixth, and seventh factors, no party argues that they are relevant. §§ 3553(a)(5), (a)(6), (a)(7).

As a result, although the § 3553(a) factors may not favor Gaffney's immediate release, they—along with evolving jurisprudence concerning extremely long sentences of imprisonment—do favor a significant modification of Gaffney's life sentence. The Court finds that modifying defendant's sentence from life imprisonment to time served effective April 3, 2023 is sufficient, but not greater than necessary, to reflect the seriousness of his criminal conduct, promote respect for the law, and provide just punishment for the offense, among other things.[7] When defendant is released from incarceration, he will be seventy years old and will remain under court supervision for five years, during which a probation officer will monitor his compliance with the law as well as the conditions of supervised release.

---

[7] Reducing Gaffney's sentence to a term of time served effective Monday, April 3, 2023, will ensure that the BOP and Probation Office have adequate time to create an appropriate release plan for Gaffney and ease him back into the community. Having a viable release plan is particularly necessary because Gaffney, who has been imprisoned since the age of 19, for nearly 50 years, will need time to adjust to life outside of prison.

## III. CONCLUSION

For the foregoing reasons, defendant Keith Eugene Gaffney's Renewed Motion for Compassionate Release [Dkt. No. 204] will be granted by an Order to be issued with this Memorandum Opinion.

Entered this 25 day of March, 2022.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge